# COURT OF APPEALS,

## June 15, 1915.

## THE PEOPLE v. MADELINE FEROLA.

(215 N. Y. 285.)

(1.) WITNESS—COMPULSORY ATTENDANCE OF ONE ACCUSED OF MURDER AS WITNESS IN A PROCEEDING WHEREIN THE CHARGE IS BEING INVESTIGATED IS A VIOLATION OF CONSTITUTIONAL RIGHTS.

The compulsory attendance of one accused of crime as a witness in a proceeding wherein the charge is being investigated, not simply the administering an oath, violates his constitutional rights irrespective of whether he is called before a coroner, a committing magistrate or a grand jury.  (N. Y. Const. art. 1, § 6.)

(2.) SAME—WHERE THE ADMISSION OF CONFESSION BEFORE CORONER DID NOT AFFECT SUBSTANTIAL RIGHTS OF DEFENDANT.

Defendant, while in custody, charged with homicide, was taken before the coroner who was holding an inquest into the death, called as a witness, sworn and gave testimony.  Thereafter, while still in custody, she was taken to the office of the district attorney and again examined.  Upon consideration of the evidence relating to both examinations, the statements being substantially alike in all essential respects, held, that while the defendant's attendance as a witness before the coroner was compulsory as a matter of law and in violation of her constitutional rights, her attendance and examination at the district attorney's office was extra-judicial and the question whether it was compulsory was for the jury, whose finding that her statement was voluntary is not against the weight of evidence; that the admission in evidence of both statements cannot be considered prejudicial to the defendant where the statement made before the district attorney so fitted in with the surrounding facts and circumstances and was so strongly corroborated by undisputed evidence as to make it practically certain that the jury's verdict was not affected in the slighest by the fact that there were two confessions instead of one.  Hence the admission in evidence of the confession before the coroner presents an error not affecting the substantial rights of the defendant which the Court of Appeals is required to disregard on appeal.   (Code Crim. Pro. § 542.)

(3.) SAME—WHEN FAILURE TO INSTRUCT JURY NOT GROUND FOR REVERSAL. The trial court neglected to inform the jury that, if they found a certain witness was an accomplice, they could not convict upon his evidence unless it was corroborated. There was a request to charge upon the subject, but it was not technically accurate and was coupled with objectionable matter so that the refusal to charge it was not technically error. *Held*, that while this court would hesitate to affirm a conviction in a capital case in which the jury was not properly instructed as to the necessity of corroboration of an accomplice if the verdict depended upon such evidence, it will not disturb such verdict where it is manifestly based on the confession of the defendant as corroborated by other evidence and when the statute on that subject (Code Crim. Pro. § 395) was read to the jury.

APPEAL from a judgment of the Supreme Court rendered May 26, 1914, at a Trial Term for the county of Bronx, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Nathan B. Levy, William S. Evans and Leo J. Rossett* for appellant.

The confession of the defendant obtained at the coroner's inquest was improperly admitted in evidence because it appeared on its face: (a) That it was involuntary and (b) that it was not taken in conformity with the statute. (People v. Rogers, 192 N. Y. 331; People v. Chapleau, 121 N. Y. 266; People v. McMahon, 15 N. Y. 384; People v. Mondon, 103 N. Y. 211; People v. Coombs, 158 N. Y. 532.) The confession of the defendant obtained by the district attorney was involuntary and erroneously admitted in evidence. (People v. Kennedy, 159 N. Y. 346; People v. Egnor, 175 N. Y. 419; People v. McMahon, 15 N. Y. 384.) The learned trial court committed error in refusing to charge the defendant's requests. (People v. Zucker, 20 App. Div. 365; 154 N. Y. 770; People v. Bright, 203 N. Y. 78; People v. Elliott, 155 App. Div. 486; People v. Katz, 209

N. Y. 311; Commonwealth v. Klein, 42 Penn. Sup. Ct. 66; Gar-land v. State, 104 S. W. Rep. 898; People v. Thomsen, 3 N. Y. Cr. Rep. 562.)

*Francis Martin, District Attorney* (*James A. Donnelly* of counsel), for respondent.

Defendant's confessions were freely and voluntarily made, and they were, therefore, properly received in evidence. (Hendrickson v. People, 10 N. Y. 13; McMahon v. People, 15 N. Y. 384; Teachout v. People, 41 N. Y. 7; People v. Mondon, 103 N. Y. 211; People v. Chapleau, 121 N. Y. 266; People v. Wright, 136 N. Y. 625; People v. Balbo, 80 N. Y. 484; People v. Giro, 197 N. Y. 152; People v. Garfalo, 207 N. Y. 141; People v. Schemerhorn, 203 N. Y. 57.) The trial court's refusal to charge several of defendant's requests was proper. (People v. Cascone, 185 N. Y. 317; People v. Ammon, 92 App. Div. 205; 179 N. Y. 540.)

MILLER, J.:

A few minutes after 10 o'clock on the night of December 29th, 1913, the body of Carmello Canestrale was found on the bridge over the railroad tracks of the New York Central railroad at One Hundred and Forty-ninth street and Park avenue in the county of Bronx. A stab wound had been inflicted in his left chest penetrating into the heart and death resulted therefrom. A broken blade of a knife was found with the body and the next morning the other part of the knife with the handle was found on the railroad tracks underneath the bridge. The defendant kept a boarding house and the deceased had been one of her boarders. On the 4th of December, 1913, the defendant and the deceased, accompanied by three of their friends, went to the marriage license bureau at the city hall in the borough of Manhattan and obtained a license to marry. Thereafter they lived

together as husband and wife until the 27th day of December, 1913, when the deceased left the defendant and went to the home of one Salvatore Peragine. The defendant had made arrangements for the wedding to take place on December 28th, 1913, but the deceased did not appear. On the following day in response to a message from her he went to her house, but he refused to marry her on the ground that she did not have sufficient money and again went away. Without going more into detail it is sufficient to say that the People's evidence strongly tended to prove that enraged by the deceased's desertion and refusal to marry her, and in all probability aided and incited by said Peragine, a witness called by the People, the defendant lay in wait for the deceased at the bridge, and there inflicted the mortal wound. The only serious question in the case arises upon the admission in evidence of two confessions made by the defendant, one on her examination at the coroner's inquest, and the other to the district attorney. Without either of those confessions the People's case would be very weak, if indeed sufficient to sustain the conviction.

On the 9th day of January, 1914, the defendant, who was then in custody, charged with the homicide, was taken before the coroner, who was holding an inquest into the death of Canestrale. She was called as a witness, sworn and asked where she lived. She answered, " 529 Morris Avenue." The coroner then said to her: " Mrs. Ferola, you are charged with homicide, in having caused the death of Carmello Canestrale. It is your privilege to testify or not, just as you see fit. Any statement that you make now can be used against you at this or any future proceeding. Knowing this, do you wish to testify? You are entitled to counsel, and you can refuse to testify until such time as you have counsel," and she replied, " I am willing to testify without a lawyer." Thereupon she was examined fully as to her relations with the deceased, the homicide and the facts leading up to it, and frankly admitted that she committed it.

At the termination of the proceeding the coroner committed her to await the action of the grand jury.

The practice of calling the accused as a witness in the very proceeding in which the charge is being investigated cannot be too severely condemned. The defendant was an Italian, unacquainted with our language. She was unattended by counsel and ignorant of her rights. It may be doubted whether as a matter of fact any information or advice given her by the coroner could have entirely removed the effect upon her mind of calling her as a witness. She was not informed that her refusal to testify could not be used against her; whereas, if the proceeding had been before a committing magistrate, it would have been the latter's duty to inform her that the mere waiver of a right to make a statement could not be used against her. (Code of Criminal Procedure, section 196.) It may be admitted that chapter 7 of title 3 of the Code of Criminal Procedure does not in terms apply, and that many of its sections are inapplicable, to a coroner's inquest. The purpose, however, of the two proceedings is the same where, as in this case, the fact of the homicide is established. In a proceeding before a committing magistrate, it is the right of the accused to make a statement not under oath, but said section requires that before he is called upon to determine whether to exercise that right he must be given certain information. That provision does not expressly apply to a case where the accused is called as a witness, for the very good reason that the statute does not contemplate such a violation of his constitutional rights. It is the calling of the accused as a witness, not merely the administering of the oath, which virtually compels him to be a witness against himself. There is a plain line of distinction between the cases on the subject in this state. On the one side are People v. Thayer (1 Parker's Crim. Rep. 595); Hendrickson v. People (10 N. Y. 13); Teachout v. People (41 N. Y. 7); People v. McGloin (28 Hun, 150; 91 N. Y. 241); People v. Chapleau (121 N. Y. 266).

On the other side are People v. Singer (18 Abb. [N. C.]96); People v. McMahon (15 N. Y. 384); People v. Mondon (103 N. Y. 211; 4 N. Y. Crim. 552). In the former class statements of the accused were held admissible, but they were made either when he had come forward of his own volition and asked to be examined, or when he was examined merely as a witness, not standing in the position of the accused, or as in the McGloin case where the examination was not in a judicial proceeding at all. In the other class it was held that it was an invasion of the rights of the accused to call him as a witness in the proceeding in which the charge against him was being examined. The distinction between the two lines of cases was pointed out by Judge WERNER in People v. Molineux (168 N. Y. 264, 331; 16 N. Y. Crim.). I repeat, the compulsory attendance of the accused as a witness, not simply the administering of an oath, violates his rights, and that, too, irrespective of the question whether the provisions of the statute applicable to proceedings before a committing magistrate apply to the case where the coroner before inquisition under section 773 of the Code of Criminal, Procedure, or after inquisition under section 783, is examining the charge against the accused, and I may add, irrespective of whether the accused is called before a coroner, a committing magistrate, or a grand jury.

The question remains whether, although it was a violation of her constitutional rights to call her as a witness, her subsequent statements were voluntary and admissible under section 395 of the Code of Criminal Procedure. That they were not voluntary as a matter of fact might well be found. But whether, in view of what was said to her by the coroner and by her to the coroner and the interpreter, it was an error of law to admit her subsequent statement in evidence is a different question. There being a difference of view among us, we leave the question undecided, because a majority of us are of the opinion that, if error was committed, it was harmless. On the 27th of January,

1914, the defendant was taken from the Tombs to the office of the district attorney by the officers who had taken her before the coroner, and was again examined. She had not then had the advice of counsel. It appears, inferentially at least, that an oath was administered to her. Her examination began thus:

" Assistant District Attorney: Any answers that you may make to the questions put to you here may be used against you, and you need not testify unless you want to. Do you wish to testify in this proceeding? A. Yes."

The language quoted and the manner in which the examination was taken may have led the defendant to think that she was being examined in a legal proceeding. However, the proceeding, like that involved in People v. McGloin (*supra*), was extra-judicial. The defendant's attendance as a witness before the coroner was compulsory as a matter of law, her attendance and examination at the district attorney's office may have been compulsory as a matter of fact, but that question was for the jury, whose finding that her statement was voluntary is not against the weight of the evidence.

Although there were immaterial variances, no more than naturally to be expected, the two statements were substantially alike in all essential respects, with possibly this difference; in the statement before the coroner the defendant identified the broken parts of the knife. In her statement before the district attorney she was not asked to do so, but she said that she used a knife which she had had about the house, and that after inflicting the wound she threw the broken part of the knife, which remained in her hand, away. That piece of evidence, strongly corroborated as it was by the finding of that part of the knife the next morning after the homicide, was even more important than her identification. The statement before the coroner, therefore, did not materially strengthen or add to the People's case. Substantially the same evidence was already in the case, when that statement was admitted, and a typical case is thus

presented of an error not affecting the substantial rights of the defendant, which we are required to disregard on appeal. (Code of Criminal Procedure, section 542.)

The judge in charging the jury quoted from the statement before the coroner, but he could as well have quoted from the other statement. The only possible view in which it could be said that the defendant was prejudiced by having both statements admitted in evidence was the added force to be given to a repetition of the confession, and we are not prepared to say but that in a doubtful case that consideration might be entitled to weight. The statement, however, made before the district attorney so fitted in with the surrounding facts and circumstances and was so strongly corroborated by undisputed evidence as to make it practically certain that the jury's verdict was not affected in the slightest by the fact that there were two confessions instead of one.

The court neglected to inform the jury, as it should have done, that, if they found that Peragine was an accomplice, they could not convict upon his evidence unless it was corroborated by other evidence " tending to connect the defendant with the commission of the crime." (Code of Criminal Procedure, section 399.) There was a request to charge upon the subject, but it was not technically accurate, and it was coupled with objectionable matter, so that the refusal to charge it was not technically error. Nevertheless we should hesitate to affirm a conviction in a capital case in which the jury were not properly instructed as to the necessity of corroboration of an accomplice if the verdict depended upon such evidence. Manifestly in this case the verdict was based on the confession of the defendant as corroborated by the other evidence, and the statute on that subject (section 395 of the Code of Criminal Procedure) was read to the jury. Counsel evidently did not deem the importance of an instruction as to the necessity of corroboration of Peragine sufficient to present a clear-cut request to charge on the

subject, but coupled the request with other matter which he was not entitled to, but which he was apparently more desirous of getting before the jury. It is a practical certainty that the jury did not convict the defendant on the testimony of Peragine.

We have examined the other points raised, but find nothing requiring further discussion.

The judgment should be affirmed.

SEABURY, J. (concurring):

I concur in the conclusion that the judgment of conviction should be affirmed. I do not concur in the opinion that there was error in the admission of the confession to the coroner. In warning the defendant that she need not make a statement the coroner did not state that her election not to make a statement could not be used against her. When the defendant was called at the inquest the coroner did make the following statement to her: "Mrs. Ferola, you are charged with homicide, in having caused the death of Carmello Canestrale. It is your privilege to testify or not, just as you see fit. Any statement that you make now can be used against you at this or any future proceeding. Knowing this, do you wish to testify? You are entitled to counsel, and you can refuse to testify until such time as you have counsel." It is claimed that although section 198 of the Code of Criminal Procedure provides that if the defendant choose to make a statement, the magistrate must take it "without oath," the coroner first administered an oath to the defendant and asked her name and address. It is also claimed that although section 198 specifies the questions which the magistrate shall put to the defendant, the coroner did not limit himself to the questions specified but examined the defendant generally as to the facts connected with the crime. In considering the question presented our statutory provisions must be kept in mind. Sections 196 and 198 of the Code of

Criminal Procedure prescribe the manner in which the statement of the defendant is to be taken by the magistrate and section 395 of the Code of Criminal Procedure codifies the law of the state governing the admission of confessions upon a trial. In terms sections 196 and 198 of the Code of Criminal Procedure apply to an examination before a magistrate and make no reference to examinations before a coroner. Considering the object of these statutory provisions, I think they were intended in cases of homicide to apply to a coroner as well as to a magistrate. (Code of Criminal Procedure, sections 147, 780; People v. Molineux, 168 N. Y. 264, 331; 16 N. Y. Crim. 120; People v. Jackson, 191 N. Y. 293; 22 N. Y. Crim. 298.) The coroner or magistrate in order to comply with the statute is not required to use the precise words of the statute in giving the prescribed caution. It is sufficient if the caution substantially complies with the statute and informs the defendant of his entire freedom to make a statement or not as he thinks best. (State v. Rogers, 112 N. C. 874; State v. De Graff, 113 N. C. 688, 693.) If we ignore for the moment the fact that the defendant was sworn and consider only the caution or warning which the coroner gave to the defendant, it is evident that the coroner's statement complied with the statute except that it omitted to inform her that if she did not make a statement, that fact could not be used against her. I think that this omission was not a substantial departure from the requirements of the statute in view of the fact that the coroner fairly left it to her to testify or not, as she chose and warned her that anything she might say could be used against her. If the fact that an oath was administered is not fatal to the admission of the confession, the fact that the warning or caution was given after she was sworn seems to me, not to have been an irregularity of substance. The fact that an oath was administered, if she had not been interrogated, could not of itself prejudice the defendant in any of her rights. If she was prejudiced at all

it was in answering the questions that were put to her, not in the fact that she was sworn.   After she had been sworn it was then made perfectly clear to her that " it is your privilege to testify or not, just as you see fit."   If she fully understood and appreciated this caution and still desired to confess, the fact that she was sworn before she was cautioned cannot as a matter of law establish that her confession was involuntary. The learned trial court left the question very fairly to the jury to determine whether this confession was voluntary.   Under the instructions which the learned court gave to the jury, we are required to assume that the jury found that this confession was not made under the influence of fear produced by threats or upon the stipulation of the district attorney, that the defendant should not be prosecuted.   Why should the fact that an oath was administered foreclose all further inquiry as to whether the confession was voluntary and require us to hold as a matter of law that the confession was involuntary? It will hardly be argued that because given under the sanctity of an oath, it was less likely to be true than if it had not been given under oath.   The law, in the requirement that witnesses shall be sworn, proceeds upon the assumption that their testimony is more likely to be true if given under oath.   In State v. Gilman (51 Me. 206) RICE, J., said: " Does it follow that because a statement is made upon oath in a proceeding where the circumstances of the commission of the crime are being investigated, and the person making such statements is a suspected or accused person, that it must necessarily be involuntarily made?   May not a man depose on oath as freely as he may speak when unsworn?   And, if so, do his statements become any less reliable than when made without the sanction of an oath? "

MORTON, J., pertinently remarked that " the fact that it was made under oath, cannot diminish its force or render its competency questionable.   If it contain a true narrative of

facts, justice requires that they should be admitted. And no man will be more likely to make false admissions against himself, because he has been sworn to tell the truth." (Faunce v. Gray, 38 Mass. 243.) It is now settled in this state that the fact that a confession was made in a judicial proceeding does not render it inadmissible. Section 395 of the Code of Criminal Procedure specifically so provides, and this court in the case of People v. Chapleau (121 N. Y. 266, 274) so held. In the case last referred to, Judge GRAY, speaking for this court, said: " It is thus perfectly clear that, both before and since the enactment of the Code provisions, the test of admissibility of the statements of a party accused of the commission of the crime, whether made in the course of judicial proceedings or not, is whether they were voluntary, and that can be determined by their nature and the circumstances under which made. If, in all respects, and however viewed, they could only have been the voluntary and uninfluenced statements of the individual, no principle of law warrants their exclusion and the Code expressly authorizes their being given in evidence upon the trial." From what has been said I think it has been shown that the fact that the confession was made in a judicial proceeding does not render it involuntary as a matter of law, and also that the fact that an oath was administered does not render it involuntary as a matter of law, unless the fact that the statute provides that the accused shall not be examined under oath, requires us to come to a different conclusion. At common law a confession, otherwise admissible, is not rendered inadmissible by reason of the fact that it was made under oath. (The King v. Lambe, 2 Leach's Cr. C. 552; Reg. v. Scott, 1 D. & B. 47; Regina v. Sansome, 4 Cox Cr. 203, 207; The Queen v. Johnston, 15 Irish C. L. 60, 83; Reg. v. Stripp, 1 Dearsley, .649; Regina v. Arnold, 8 C. & P. 621.)

The statutory provision embodied in section 198 of the Code of Criminal Procedure was taken from part IV, chapter II,

title 2, section 14 of the Revised Statutes, which was itself taken from the Laws of 1813 (2 Revised Laws of New York, page 507, section II). It was modelled upon the statutes of 1 & 2 Philip & Mary, c. 13, and 2 & 3 Philip & Mary, c. 10, which in England were amended and amplified in 7 George IV and 11 & 12 Victoria. It appears clearly from the history of the statute that its purpose was to prescribe the rules which should govern the conduct of magistrates, and that it was not designed to alter the rules of evidence governing the admissibility of confessions upon a trial. (Stephen's History of the Criminal Law, vol. I, p. 219. See, also, The King v. Lambe, *supra;* State v. Gilman, 51 Me. 206.)

Bearing in mind the purpose of these statutes it is necessary to consider whether the fact that the statement was taken in violation of the statute, renders it inadmissible in evidence upon the trial. The decisions have not been consistent and most of them are *nisi prius* rulings and nothing is to be gained from a detailed review of them. There are a few well-reasoned opinions on the subject, delivered upon appeal, which merit attention. In The King v. Lambe (*supra*) the question whether a confession by a prisoner which was not signed, as required by the statute, either by the prisoner or the magistrate, was considered and determined. Mr. Justice GROSE, delivering the opinion of the twelve judges for whose consideration the question had been reserved, said that the confession " is clearly receivable in evidence at common law." He then considered the question whether it was rendered inadmissible by reason of the statute. He referred to the nature of the examination before the magistrate and said that when the examination " contains a confession, [it] is admitted, not by force of the statutes, but by the common law, as strong evidence of that fact. Consider for a moment what an absurdity would follow, if the manner and form in which a confession is reduced into writing were to be the ground of an objection

against receiving the confession in evidence. The confession of a fact by the prisoner to the constable, the moment before they entered the office of the magistrate, might, on the *viva voce* testimony of the constable, be given in evidence; but a confession made on the other side of the office door, in the presence and hearing of the magistrate, could not be given in evidence if reduced into writing, unless such writing were signed by the prisoner. A proposition which needs only to be stated to shew its weakness and absurdity! The Leislature has not, by even a remote expression in either of the statutes, signified an intention to alter the nature of evidence, or to prevent that from being received as evidence against a prisoner now, which was receivable as evidence before. The intention was merely to compel justices of the peace to return the examination of the prisoners, and the information of those who appeared against them, for the purposes, and very wise ones they are, apparent on the face of the statutes. As matter of future evidence it was not even in the contemplation of the Legislature. But at the time when these statutes passed, the examinations which they directed to be taken, became evidence, where they contained confessions, by operation of law, leaving all other confessions, good or bad, as they were before those statutes were made; and it is clear, that what a prisoner confessed before a justice of the peace, previous to the reign of Philip and Mary, if not induced by hope or extorted by fear, whether reduced into writing or not; or, if reduced into writing, whether signed or not, if admitted by the prisoner to be true, was and is as good evidence as if in the adjoining room previous to his having been carried into the presence of the justice, or after he had left him, or in the same room before the magistrate comes, or after be quits it. Thus, as it seems to me, the point in question stands both at the common law, and upon the construction of the statutes; and authorities are not wanting to support the principles of this decision." In Regina v. Sansome

(1850, *supra*) it was held that a statement of a prisoner not taken in the form prescribed by statute may still be given in evidence against him upon his trial. In that case Lord CAMP-BELL, Ch. J., said: " We are all of opinion that this objection is unfounded. * * * Now it has been argued * * * that the statute makes it a condition precedent that the magistrate should ' state to the prisoner and give him clearly to understand that he has nothing to hope from any promise of favor, and nothing to fear from any threat which may have been holden out to him, to induce him to make any admission or confession of his guilt; but that whatever he shall then say may be given in evidence against him upon his trial notwithstanding such promise or threat,' but in this case there was no evidence of any promise or threat whatever, and therefore there could be no necessity for showing that any caution had been given; for I am of opinion that the giving of such caution cannot be a condition precedent to the admissibility of every declaration made by a prisoner before a magistrate read over to him and signed by him. It seems to me that that proviso contains merely a direction to the magistrate how to proceed, and not a condition precedent. If he neglects his duty, there is no clause of nullity in the statute, nothing to exclude a confession which would be admissible at common law."

In this country, also, similar statutes copied from the English statutes, which have been referred to, have given rise to conflicting decisions. The general rule in this country is the same as in England, and where no statutory provision is violated the sworn or unsworn statements made by the accused before a magistrate are admissible if voluntary, and whether or not they are voluntary is a question of fact for the jury. (People v. Kelley, 47 Cal. 125; Kansas v. Sorter, 52 Kans. 531; Commonwealth v. Reynolds, 122 Mass. 454; People v. Taylor, 59 Cal. 640; State v. Glass, 50 Wis. 218; State v. Wisdom, 119 Mo. 539, 541; State v. Punshon, 133 Mo. 44;

State v. Gilman, 51 Me. 206.) Where the confession was taken by the magistrate in violation of the statute it was held, in State v. Briggs (68 Ia. 416), and Anderson v. State (133 Wis. 601, 609), that it was, nevertheless, admissible, although the contrary was held in State v. Parker (132 N. C. 1014).

We come now to a discussion of the cases in this state which are far from being harmonious. It would be in vain to attempt to reconcile them. In the Hendrickson Case (1854) (10 N. Y. 13) it was held that a statement made under oath before the coroner by a person against whom suspicion was directed was admissible in evidence upon the trial of that person for murder. In the McMahon Case (1857) 15 N. Y. 384) the prisoner was taken by a constable before a coroner and sworn and examined as a witness, and it was held that his evidence before the coroner was not admissible upon his trial for murder. In the Teachout Case (1869) (41 N. Y. 7) a statement made by a prisoner, who knew he was suspected of having poisoned the deceased, to the coroner under oath, was held to be admissible. In the McGloin Case (1882) (91 N. Y. 241) a person arrested, charged with murder, made a confession which the coroner took down, not in his official capacity but as clerk, and it was held that his confession was admissible in evidence on his trial for murder. In the Mondon Case (1886) (103 N. Y. 211) the facts were practically the same as in the McMahon case. A person under arrest accused of causing death by criminal means gave evidence, under oath, before the coroner, and upon his trial such evidence was held not to be admissible. In the Chapleau Case (1890) (121 N. Y. 266) the day after the homicide a person under arrest gave testimony under oath before the coroner as to the circumstances of the homicide. His evidence was held to be admissible upon his trial. These are the leading cases in this court upon the question under consideration, and the brief statement above given of the facts and decision in each case disclose a conflict which is irrecon-

cilable. There have been many other cases which referred to these cases although they are dissimilar upon their precise facts and need not now be discussed. (People v. Molineux, *supra;* People v. Rogers, 192 N. Y. 331, 22 N. Y. Crim. 376; People v. Randazzio, 194 N. Y. 147, 23 N. Y. Crim. 158; People v. Garfalo, 207 N. Y. 141.) The principle of the Hendrickson case was followed by Chancellor WALWORTH when circuit judge, in People v. Thayer (1 Parker, 595). A recognition of the fact that the decisions in this state upon this subject are inconsistent and irreconcilable is necessarily a first step to the enunciation of a clear rule in harmony with sound legal principles and one that is capable of serving as a guide to trial judges charged with the duty of presiding over that class of cases in which this question is most likely to arise. As our own precedents upon the subject are directly opposed to one another, we are entirely free to adopt a rule which shall be in accord with those decisions in our own court and in other jurisdictions which are based upon rational principle. The late Professor Thayer in commenting upon the administration of the criminal law pointed out that it " is sadly enfeebled by a continuance of some rules and practices which should have disappeared with the cruel laws they were designed to mitigate." Among the enfeebling influences to which he specifically made reference is " the absurd extreme to which the rule about confessions in evidence is sometimes pressed." (A Preliminary Treatise on Evidence at Common Law, p. 551, note 1.) Confessions voluntarily made, which are illegally obtained, are not on that account nullified and rendered inadmissible in evidence. Such confessions are receivable in evidence under the general rule that illegality in obtaining a confession will not justify its exclusion. (People v. White, 176 N. Y. 331, 17 N. Y. Crim. 538; People v. Buffom, 214 N. Y. 53.) " It has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has

been enabled to obtain the evidence. The illegality is by no means condoned; it is merely ignored." (Wigmore on Evidence, section 2183.) Thus evidence obtained as a result of illegal search and seizure (People v. Adams, 176 N. Y. 352, 17 N. Y. Crim. 558) and confessions obtained by fraud or deceptive practices (People v. Buffom, 214 N. Y. 53) are receivable in evidence. The same rule is applicable to evidence of a confession obtained upon an examination of an accused person before a magistrate which is not taken in conformity to law. There is a line of cases, founded entirely upon the dissenting opinion of Judge SELDEN in the Hendrickson case and his prevailing opinion in the McMahon case, which treat confessions under oath thus illegally obtained as an exception to this rule. It is this supposed exception to the general rule which has disturbed the harmony of the decisions of this state and afforded the only ground to doubt that such confessions if voluntary are receivable in evidence upon the trial of the person accused. In my judgment there is no basis for recognizing such an exception. In his dissenting opinion in the Hendrickson case Judge SELDEN contended for the view that declarations of a person made under oath and before he was accused or arrested were not receivable against that person upon his subsequent trial. This opinion was based upon the fact that the questions put to Hendrickson must have informed him that he was suspected. His argument was based upon the following principle: " The object of the law is to ascertain truth; and it rejects no evidence, come from what source it may, which is calculated to throw light upon it. The mental disturbance produced by a direct accusation, or even a consciousness of being suspected of crime, is always great, and, in many cases, incalculable. The foundation of all reliance upon human testimony is that moral sentiment which almost universally leads men, when not under strong counteracting influence, to tell the truth. This sentiment is sufficiently powerful to resist a

trifling motive, but will not withstand the fear of conviction for crime. Hence, the moment that fear seizes the mind, the basis of all reliance upon its manifestations is gone. * * * The mind, confused and agitated by the apprehension of danger, cannot reason with coolness; and it resorts to falsehood when the truth would be safer, and is hurried into acknowledgments which the facts do not warrant. Neither false statements nor confessions, therefore, afford any certain evidence of guilt when made under the excitement of an impending prosecution for crime." (p. 33.) Although in the Hendrickson case, Judge SELDEN expressed his views in a dissenting opinion, in the McMahon case he embodied the same views in the prevailing opinion, but expressed much more clearly the reason for his opinion. In the McMahon case, a prisoner under arrest charged with murder, was taken before the coroner and sworn and examined, and his examination was admitted against him upon his trial. This court held that this confession was not receivable in evidence and in his opinion Judge SELDEN was careful to state the precise reason why it was not receivable. He distinctly held that it was not objectionable " because a mere arbitrary rule, which prohibits magistrates from taking the examination of prisoners charged with crime upon oath, has been violated." (p. 395.) After stating that the evidence was not objectionable on the ground of the violation of the statute or because any immunity or privilege of the accused was violated, he said: " This leaves no other foundation for the rule than that which I have suggested, viz:—that the statement to be admissible, must proceed from the internal and spontaneous impulses of the prisoner alone, uninfluenced by any extraneous cause, of sufficient force to prevent free and voluntary mental action. It is considered that a judicial oath, administered when the mind is disturbed and agitated by a criminal charge may have that effect, and hence the exclusion. Upon no other principle, as I conceive, can the cases be reconciled with each

other or with reason." From Judge SELDEN's opinions in the
Hendrickson and McMahon cases, therefore, it appears that
the reason why sworn statements of a prisoner taken before a
magistrate are not receivable in evidence, is not because the
statute under which the magistrate assumed to act was violated,
but solely because where the prisoner's " mind is disturbed and
agitated by a criminal charge," administering a " judicial oath "
prevents free and voluntary mental action. The theory that the
administering of the oath so disturbs and agitates the prisoner's
mind as to render his confession unworthy of belief has been
shown to be invalid. One " may testify as freely as he may
speak." (State v. Gilman, 51 Me. 206.) The analysis to which
Prof. Wigmore has subjected this theory has disclosed its
fallacious character. (Wigmore on Evidence, section 845, p.
963, vol. 1.)

The fact is, that the notion that the single circumstance
that an oath is administered operates upon the mind so as to
prevent free and voluntary action, is wholly fanciful, contrary
to the experience which teaches us to receive testimony in other
cases when given under the solemnity of an oath and loses sight
entirely of the purely historical reasons which led to the pro-
hibition against taking the testimony of accused persons under
oath. The history of the rule against such examination shows
that the reasons which prompted the rule are no longer ap-
plicable. The administration of an oath was the initial step
in the procedings existing in the ecclesiastical tribunals, and
in the struggle which took place to restrict the jurisdiction
of these tribunals, acts of Parliament were passed which at-
tacked the practice of examination under oath. " The original
motive for the Acts," says Mr. Lowell in an instructive article,
" was not a dislike of the oath, but a desire to free laymen
from the jurisdiction of these tribunals by prohibiting the first
step in their regular course of procedure. As often happens,
however, the means finally became an end in itself." (Judicial

Use of Torture, 11 Harvard L. Rev. 293.) Another reason for the reluctance in taking the examination of an accused person under oath, was that at common law the accused was not competent to testify at all, and, therefore, it was not deemed lawful to examine him under oath. Neither of these reasons operate to-day and the rule that confessions made under oath upon an examination before a magistrate are inadmissible upon the trial rests upon no other basis than the theory elaborated by Judge SELDEN. From what has been said I think it is clear that the principle that a confession is necessarily and as a matter of law involuntary because given under oath, is without any support in reason. If voluntary confessions are receivable in evidence even if illegally obtained, there is no reason for making an exception to this general rule so as to exclude confessions simply because they are made under oath.

The only other case in this court which is identical with the McMahon case, which has followed it, is the Mondon case. Judge RAPALLO in his opinion in that case said that it was " identical in all its essential features with the McMahon case " (p. 218), and it was decided upon the authority of that case. In his opinion Judge RAPALLO held the evidence inadmissible not only on the ground that the prisoner's statement had been made under oath, which was the only ground of the decision of the McMahon case, but asserted as an additional reason that the statute prohibited such an examination. This last ground that Judge RAPALLO urges in the Mondon case was expressly stated by Judge SELDEN in the McMahon case not to be a good ground for the exclusion of the evidence. Thus the two decisions in the McMahon and Mondon cases, which are the only authorities in this court which can be claimed to furnish authority for holding that the defendant's confession to the coroner was inadmissible, are not only contrary to the decisions of this court in the Hendrickson, Teachout, McGloin and Chapleau cases, but they are inconsistent with each other. Under these

circumstances I think that we should declare the McMahon and Mondon decisions overruled, and accept as correctly indicating the rule to which this court will in the future adhere, the principle asserted in the Hendrickson, Teachout, McGloin and Chapleau cases. There is only one other argument, so far as I know, which has been urged against the adoption of this course, and that is that the McMahon case has stood for over half a century, and that it should not now be questioned. The first answer to this argument is that it has not been unquestioned. The other cases in this court, with the exception of the Mondon case, have given to it only lip-service, while the reasoning in the Teachout and Chapleau cases repudiated the fundamental principle upon which it rests. Indeed, in Brightly & Danforth's notes to the Hendrickson case, in tenth New York, they quote MULLIN, J., in People v. Montgomery (13 Abb. Pr. [N. S.] 251) to the effect " that the case of McMahon (*supra*) is overruled by that of Teachout v. People (41 N. Y. 7), and the principle decided in Hendrickson v. People (*supra*) reaffirmed, and, it is to be hoped, permanently established as the law of the State." In the Mondon case, RUGER, Ch. J., and EARL, J., dissented from the opinion of RAPALLO, J. In other courts the reasoning of the McMahon case has been attacked as unsound. Judge BENEDICT in United States v. Graff (14 Blatch. 380, 386) said: " I know of no authority binding upon the courts of the United States, which compels the holding that an arrest, or a charge of crime, or being sworn, or all three combined, are sufficient to exclude a confession that otherwise appears to have been freely made, without the influence of threat or promise." Assuming that it be true that the authority of the McMahon case has not been questioned in this court for over half a century, that fact furnishes no reason why it should not now be questioned. To follow the McMahon case is to perpetuate an erroneous principle in a most important branch of the law and to defend the authority of that case, not because it is sound

but because we have grown accustomed to its error.   Ample protection to the rights of a person accused of crime will be afforded if we overrule the McMahon and Mondon cases, and adhere to the sounder principle declared in the Hendrickson, Teachout, McGloin and Chapleau cases, and the statutory rule embodied in section 395 of the Code of Criminal Procedure.   If we are not to adopt this course and are still to recognize the authority of the McMahon case which held a confession not receivable in evidence because it was given under oath and not because it was taken in violation of the statute, then logically we are required to hold that the confession made under oath to the district attorney was also improperly received in evidence. The fact is, that there is no good reason for holding either of these confessions inadmissible.   They were freely and voluntarily made.   No threat was made or promise or hope of reward held out.   The defendant was arrested shortly after the murder.   She showed a complete willingness to confess her crime. The confession was not conclusive but merely evidence which the jury might consider in the light of any explanation that the defendant might offer.   The question whether it was voluntary was submitted to the jury who were instructed to disregard it altogether if they were not satisfied that it was voluntary.   The evidence justified their finding that it was voluntary.   There remains to be considered the question whether in examining the defendant before the coroner her constitutional privilege against self-incrimination was violated.   In considering this aspect of the case the alleged violation of sections 196 and 198 of the Code of Criminal Procedure is in no way involved.   I can find no basis for the contention of counsel that the defendant was compelled to testify either before the coroner or district attorney.   Her right to refuse to testify was explained to her.   She knew that she had the option to speak or to keep silent.   She choose to confess.   She was not subjected to compulsion of any kind.   She had the right to waive her .

privilege and did waive it when she consented to testify and answered all the questions put to her.  It follows that her constitutional right was not violated.  (Connors v. People, 50 N. Y. 240; People v. Guidici, 100 N. Y. 503, 508; People v. Casey, 72 N. Y. 393, 399; People v. Tice, 131 N. Y. 651, 657; 10 N. Y. Crim. 170; Chamberlain v. Willson, 12 Vt. 491; Twining v. New Jersey, 211 U. S. 78.)  The fact that the assistant district attorney asked the defendant if she wished to testify " in this proceeding " when there was not, strictly speaking, any legal " proceeding " before him, does not prove that he practiced deception upon the defendant.  Before asking her if she was willing to make a statement he instructed her fully and fairly as to her legal rights.  The circumstance that he used the word " proceeding " in warning her is wholly insufficient to warrant us in concluding that he practiced deception upon her.

For these reasons I vote in favor of affirming the judgment of conviction.

COLLIN, J. (dissenting):

On December 29, 1913, in the city of New York, Carmello Carnestraro (or Carnestralc) was killed by a stab.  Within a brief time afterward the defendant was arrested under the charge that she inflicted the stab and was imprisoned in the Tombs prison, where she remained until her conviction of murder in the first degree.  On January 9, 1914, a coroner of the county of Bronx held an official inquest into the cause of the death of Carnestraro.  During the progress of the inquest the defendant was taken by two police officers from the Tombs to the place of the inquest to be examined in the inquest by the coroner.  She was an Italian.  Having been brought before the coroner, the oath was administered to her by the coroner through the official interpreter, and the coroner then through the interpreter asked and received her answer to the question " Where do you live? " and then said: " Mrs. Ferola, you are

charged with homicide, in having caused the death of Carmello Carnestrale. It is your privilege to testify or not, just as you see fit. Any statement that you make now can be used against you at this or any future proceeding. Knowing this do you wish to testify? You are entitled to counsel and you can refuse to testify until such time as you have counsel." The defendant replied through the interpreter: " I am willing to testify without a lawyer." The coroner then examined the defendant by asking her fifty-two questions, or thereabouts, and receiving her answers through an interpreter. At the close of the inquest the coroner held the defendant and remanded her to the Tombs prison to await the action of the grand jury.

On January 27, 1914, the defendant was taken by the police officers from the Tombs to the office of the district attorney and before an assistant district attorney, with whom were the official stenographer and the official interpreter. The assistant district attorney administered the oath to her through the interpreter and then said to her: " Any answers that you may make to the questions put to you here may be used against you, and you need not testify unless you want to. Do you wish to testify in this proceeding? " Defendant said, " Yes." The assistant district attorney then subjected the defendant to an examination, lasting about two hours, which was taken stenographically and fills sixteen pages of the record before us. While the examination by the coroner and that by the assistant district attorney are unlike in several particulars, they contain, in effect, similar statements of the defendant that she stabbed Carnestraro. Each was received in evidence under the comprehensive objections of the defendant's counsel and his exceptions. I am of the opinion that therein there was prejudicial error.

*First*, as to the examination by the coroner. Sections 773 to 790 of the Code of Criminal Procedure relate to the functions of coroners. They are required to inquire (in certain counties with a jury) into the cause of any death suspiciously or vio-

lently caused; to compel the attendance of and to examine witnesses and cause their testimony to be reduced to writing and filed; to ascertain the persons chargeable with the deaths and issue warrants for the arrest of, if not in custody, and commit the accused persons to await the results of the inquisitions; to render decisions (or take the verdicts of juries) as to the causes of deaths and the guilty persons, for whom, if not in custody, they must issue their warrants to be served as prescribed in section 782. Section 783 is: " Proceedings of magistrate on defendant's being brought before him. The magistrate or coroner, when the defendant is brought before him, must proceed to examine the charge contained in the inquisition or information, and hold the defendant to answer, or discharge him therefrom in the same manner, in all respects, as upon a warrant of arrest on an information." By section 1571 of the Greater New York charter, coroners within that city possess the powers and perform the duties prescribed by the laws of the state relating to coroners.

In People v. Jackson (191 N. Y. 293, 297; 22 N. Y. Crim. 298) we said: " While the chief duty of a coroner is to hold an inquest when a suspicious death has occurred within his county, by recent legislation he has been given the power of a magistrate in a limited class of cases. (L. 1887, ch. 321; L. 1889, ch. 404.) He can exercise that jurisdiction only when some person has been killed or dangerously wounded by another, but in that class of cases he has the right to issue warrants, hold examinations and commit or discharge the accused, the same as any of the regular magistrates." Although the record or the briefs do not so disclose, it must be assumed, in the absence of other empowerment, that the coroner caused the defendant to be present at the inquest, examined her and held her to await the action of the grand jury and by virtue of the section 783. While within the definitions of the Code of Criminal Procedure (§§ 959, 147) the coroner was not a magistrate, the defendant when brought

before him for examination, under arrest for the killing, was
entitled under the section 783 and the judicial decisions (Mc-
Mahon v. People, 15 N. Y. 384; Teachout v. People, 41 N. Y. 7;
People v. Mondon, 103 N. Y. 211; 4 N. Y. Crim. 552) People v.
Chapleau, 121 N. Y. 266) to the constitutional and statutory
protection due a prisoner before a magistrate for examination.
Such protection is prescribed by sections of the Code of Criminal
Procedure.   Section 196 is:  " When the examination of the
witnesses on the part of the people is closed, the magistrate
must inform the defendant, that it is his right to make a
statement in relation to the charge against him (stating to
him the nature thereof) ; that the statement is designed to
enable him, if he sees fit, to answer the charge and to explain
the facts alleged against him; that he is at liberty to waive
making a statement; and that his waiver cannot be used
against him on the trial."   Section 198 is:  " If the defendant
choose to make a statement, the magistrate must proceed to
take it in writing, without oath, and must put to the defendant
the following questions only:   What is your name and age?
Where were you born?   Where do you reside, and how long
have you resided there?   What is your business or profession?
Give any explanation you may think proper, of the circum-
stances appearing in the testimony against you, and state any
facts which you think will tend to your exculpation."   Section
199 is:  " The answer of the defendant to each of the ques-
tions must be distinctly read to him as it is taken down.   He
may thereupon correct or add to his answer, and it must be
corrected until it is made conformable to what he declares
to be the truth."   Section 200 provides that the statement
must be reduced to writing and authenticated in a manner it
defines.

It is manifest from the facts already stated that the coroner
did not in the examination of the defendant even substantially
comply with the mandates of those sections or afford or secure

to her the protection they imperatively direct should be given her. To hold otherwise is to judicially reconstruct them in substance and in effect. Their primary and direct purpose and intent are to fulfill and enforce the constitutional enactment that "No person shall be * * * compelled in any criminal case to be a witness against himself" (Constitution, art. 1, § 6), and which is reiterated in section 10 of the Code of Criminal Procedure in the words: "No person can be compelled in a criminal action to be a witness against himself." They are neither arbitrary rules nor rules for the purpose of obtaining from an accused person a confession which shall have upon his subsequent trial for the offense charged testimonial trustworthiness. Rather are they in aid and preservation, in the matter of such examinations, of the principle which is of the essence of constitutional liberty and security that any forcible and compulsory utterance of a man's own testimony for the purpose of convicting him of a crime charged against him is an invasion of his indefeasible right of personal liberty and security,—a process which leads to physical force, brow-beating and torture, cruel and inhuman to the innocent as well as the guilty and dangerous to the innocent. They are the legislative interpretation and application, in the point of such examinations, of the constitutional interdiction and create the point at which willingness and freedom in making statements end and compulsion begins. A statement made by a prisoner under a disobedience of or failure to conform to the substance and intent of their provisions is, as a matter of law, not voluntary; it is compulsory. In his trial upon the accusation, for which he is imprisoned, presented in an indictment, the question of the truthfulness or testimonial value of the statement is not involved and may not be considered by the court or submitted to the jury. The violation of the Constitution and the statute in obtaining it shall not be repeated by its introduction at the

trial. As was said by Mr. Justice BROWN in Brown v. Walker (161 U. S. 591, 597): "So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."

Section 395 of the Code of Criminal Procedure is: "A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor; but is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed." The rule thus declared is not new or modern. It was of the common law and was embodied in the statutes of England from which our statute was derived. It is and must be subordinate and subservient to the Constitution and the statutes auxiliary to it. It is and should remain the established law that the statement of a person, charged with and under arrest for a crime, made at an inquest as to that alleged crime by a coroner, or at an examination after inquisition, through examination by the coroner in substantial transgression and disobedience of sections 783, 196 and 198 of the Code of Criminal Procedure, is, as a matter of law, compulsory and involuntary and is incompetent and inadmissible against the accused upon his trial for the crime. (People v. Molineux, 168 N. Y. 264, 331; 16 N. Y. Crim. 120; People v. McMahon, 15 N. Y. 384; People v. Mondon, 103 N. Y. 211; People v. Kennedy, 159 N. Y. 346, 361; Adams v. State, 129 Ga. 248; State v. Clifford, 86 Iowa, 550; Wharton's Criminal Evidence [9th ed.], §§ 666, 668.)

I am unable to discern any conflict in the decisions of this court relating to the question. They have consistently upheld the rules as stated by Judge WERNER in People v. Molineux (168 N. Y. 264, 331) : " What were the defendant's right at the inquest? If the defendant, when he attended the inquest, was under arrest or formal accusation for the murder of Mrs. Adams, he was entitled to be informed of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and before any further proceedings were had. (Code Crim. Pro. section 188.) This section is in terms applicable only to examinations before a magistrate. It is, however, merely a codification of the common law rule, and this court has held that when a person is called upon to testify at a coroner's inquest, convened to inquire into a crime, for the commission of which such person is then under arrest, or upon which he has been formally accused, he occupies the same position, and he has the same rights, as though he were before an examining magistrate. (People v. Mondon, 103 N. Y. 211.) So, on the other hand, if the person who testifies at the inquest does so simply as a witness, he has none of the rights or immunities of a party. This is the foundation of the rule which is now firmly established in this state—that when a person testifies at an inquest as an accused or arrested party, his testimony cannot be used against him upon a subsequent trial of an indictment growing out of the inquest, unless his testimony has been voluntarily given after he has been fully advised of all his rights and has been given an opportunity to avail himself of them. (People v. Chapleau, 121 N. Y. 267.) The logical and necessary corollary of that part of the rule stated is that when a person testifies simply as a witness and not as a party, his testimony can be used against him even though he is afterwards indicted and tried for the commission of the crime disclosed by the inquest. (Hendrickson v. People, 10 N. Y. 14; Teachout v.

People, 41 N. Y. 7.) " There is a substantial and cardinal
distinction between the cases in which a person charged with
a crime is compelled, either through a subpœna or an arrest,
to attend a judicial investigation concerning the crime and
his guilt, is directed to take the oath of a witness and the
witness stand and then compelled to elect whether to be or
decline to be examined, and that in which while present at the
investigation he is informed of his right to make a statement
if he desires and that his silence cannot prejudice him, or that
in which he volunteers and requests to be sworn and have the
status of the ordinary witness. In People v. Mondon (103 N.
Y. 211, 220, 221; 16 N. Y. Crim. 120) we said through Judge
Rapallo: " But I do not apprehend that this provision
(section 395) was intended to apply to any but voluntary
confessions, or to change the statutory rules relating to the
examination of prisoners charged with crime. The Criminal
Code retains the provisions of the Revised Statutes applicable
to such examinations, which provisions are framed with ref-
erence to the constitutional provision that no person shall
in any criminal case be compelled to be a witness against him-
self. (Art. 1, § 6.) In all the cases in which reference has
been made to the subject, it seems to be conceded that an
examination of a person arrested on a criminal charge, con-
ducted in violation of the statutory provisions, would not
be admissible in evidence against him on his trial for the
offense. To take a prisoner before a magistrate, swear him,
subject him to a minute interrogation as to the circumstances
relied upon as evidence of his guilt, and then use such an
examination on his trial, would be a departure from our
system of criminal jurisprudence which should not be tol-
erated, and whether the investigation were conducted before
a committing magistrate, or before a coroner's jury, could
make no substantial difference, provided it appeared that a
homicide had been committed, and the prisoner was brought

before the inquest as an accused person, and the object of the inquisition was to ascertain his guilt. * * * When a coroner's inquest is held before it has been ascertained that a crime has been committed, or before any person has been arrested charged with the crime, and a witness is called and sworn before the coroner's jury, the testimony of that witness, should he afterward be charged with the crime, may be used against him on his trial, and the mere fact that at the time of his examination he was aware that a crime was suspected, and that he was suspected of being the criminal, will not prevent his being regarded as a mere witness, whose testimony may be afterward given in evidence against himself. If he desires to protect himself he must claim his privilege. But if, at the time of his examination, it appears that a crime has been committed and that he is in custody as the supposed criminal, he is not regarded merely as a witness, but as a party accused, called before a tribunal vested with power to investigate preliminarily the question of his guilt, and he is to be treated in the same manner as if brought before a committing magistrate, and an examination not taken in conformity with the statute cannot be used against him on his trial for the offense." In People v. Chapleau (121 N. Y. 266, 274) we said through Judge GRAY: " There [in the Mondon case] the examination before the coroner was excluded; not because of any principle of inadmissibility inherent in the evidence generally, but, because it had not and could not have been, in the nature of things, a voluntary confession. There the prisoner upon being arrested was brought before the coroner as a witness and examined. He was an ignorant man; was unattended by counsel and was not informed of his rights or privileges as to testifying. Judge RAPALLO reviewed this question of the admissibility of the examination of persons under oath before a magistrate or coroner. He held that they must be excluded upon the subsequent trial for the offense, under cir-

cumstances, where the prisoner, having been arrested as a suspected murderer, was taken before the coroner's inquest or examining magistrate, and there examined on oath as to circumstances tending to connect him with the crime. His opinion was given with reference to the facts of the case before him, which showed that there was no confession; but an examination before a magistrate. He expressly held that section 395 of the Code was intended to apply only to voluntary confessions, and not to change the statutory rules relating to the examination of prisoners charged with crime." In People v. McGloin (91 N. Y. 241, 245) the coroner was acting in a private capacity " as a mere clerk to take down and prove the confession," and not in an official capacity.

*Second*, as to the examination by the assistant district attorney. This examination was not in fact made in a judicial investigation of the accusation against the defendant, but by a private person. (People v. Rogers, 192 N. Y. 331, 350.) That the examination was made under oath, or while the defendant was under arrest and accusation, or to the prosecuting attorney, or in answer to questions put to the defendant, or under those conditions combined did not render it inadmissible. (Cox v. People, 80 N. Y. 500; People v. Garfalo, 207 N. Y. 141; People v. Giro, 197 N. Y. 152; 24 N. Y. Crim. 255.) The test is whether the statements made were voluntary, whether the defendant had any inducement to tell a falsehood against herself or felt compelled to speak for any reason when she preferred to remain silent. Was the condition of mind which made her willing to answer brought about by her own independent reasoning? The fact that a defendant may conclude it will be advantageous to him to confess rather than keep silent is immaterial, if conditions or circumstances are not created which tend to make silence some evidence of guilt and if his mental operations are free from and uninfluenced by any external inducement to falsify or invent.

(People v. White, 176 N. Y. 331, 349; 17 N. Y. Crim. 538; People v. Rogers, 192 N. Y. 331, 346; Balbo v. People, 80 N. Y. 484, 499; People v. Chapleau, 121 N. Y. 266, 273.) Without entering with particularity into the facts which raised an issue of fact as to the voluntariness of the statement or confession to the assistant district attorney, among which were the nativity, ignorance, inexperience and condition in life of the defendant, that she had been theretofore exhaustively examined by the coroner, that she without request or suggestion on her part was taken before and was attended through her examination by the police officers who took and were with her before the coroner, that the oath was administered to her and she was asked if she was willing to " testify in this proceeding," that she made no statement except under the similar conditions existing at the inquest and this proceeding, I state the conclusion that the trial court did not err in receiving the confession in evidence and instructing the jury to reject and disregard it, unless they found it was voluntarily made.

*Third,* it is urged that although there was error in receiving in evidence proof of the statements made by the defendant before the coroner, it was harmless, because the statements were substantially in the examination by the assistant district attorney which had been theretofore proven. From that view, I earnestly dissent. In People v. Koerner (154 N. Y. 355, 12 N. Y. Crim. 503) we laid down relevant rules for capital cases, since loyally and wisely adhered to. An error which could by any possibility have influenced the minds of the jury is prejudicial and not harmless. A person on trial for his life is entitled to all the advantages which the laws give him, and among them is the right to have his case submitted to an impartial jury upon competent evidence. An error existing, the People, in order to nullify it, must show that it could by no possibility have prejudiced the defendant. The existence of the error establishes the defendant's claim to re-

lief, and to sustain a verdict of conviction the People must prove that the error did not and could not have affected it. (People v. Corey, 157 N. Y. 332, 12 N. Y. Crim. 151; People v. Maine, 166 N. Y. 50, 15 N. Y. Crim. 341; People v. Mills, 178 N. Y. 274, 306; 18 N. Y. Crim. 269.)   The first duty of a court is not to punish crime, but to punish it through just and lawful procedure.

The People upon the trial deemed proof of the statements of the defendant before the coroner of supreme importance. The prosecuting attorney persistently met and sought to overcome the strenuously interposed objections of the defendant. The People sought aggressively and successfully by proof and summation to plant in the minds of the jury, not an incidental or adjunctive fact, but an independent and persuasive fact, to wit, that the defendant declared her guilt at different times and under different conditions, which they manifestly believed, and correctly, would tend to procure a conviction.   The reasons for their belief were as sound after the examination had been used in procuring the conviction as when they proved it.   Having convinced the court that it was material and competent and urged it upon the minds of the jury, they should not now be permitted to say that it was immaterial and harmless.   In Bram v. United States (168 U. S. 532, 542) Mr. Justice White, writing for the court, said: " The contradiction involved in the assertion that the statement of an accused tended to prove guilt, and therefore was admissible, and then after procuring its admission claiming that it did not tend to prove guilt, and could not, therefore, have been prejudicial, has been well stated by the Supreme Court of North Carolina, State v. Rorie, (1876) 74 N. C. 148: ' But the State says this was a denial of guilt, and not a confession.   It was a declaration which the State used to procure a conviction; and it is not for the State to say the declaration did not prejudice the prisoner's case.   Why introduce it at all unless it was to lay a foundation for the prosecution?   The use which was made of the prisoner's

statement precluded the State from saying that it was not used to his prejudice.' "

The trial judge in his charge referred to the statements or " confessions," and directed the jury to determine under what circumstances they were made, and if under the influence of fear, produced by threats, they should reject them or either of them so made as of no weight. He read to the jury the part of the confession before the coroner descriptive of the stabbing, and from that before the district attorney a few sentences, adding slightly to the description. It may be safely and properly asserted that the evidence in proof of the defendant's guilt was, apart from the examinations, very slight.

The jury were to determine the probative weight and value of the " confession." This is not a case where a fact erroneously proven by incompetent evidence was subsequently proven by competent evidence and the incompetent evidence thereby rendered harmless. A question was, the extent of the belief and force that should be given to the statements of the defendant. It is common knowledge, and one has a slight understanding of the mental operations of himself or others who denies that the reiteration of a statement at a different time, under different conditions and circumstances and to different persons does appreciably enhance its credibility and evidential weight. The consistency in the repetitions, the willingness and the ability to reproduce the statement naturally and necessarily urge belief in its integrity and tend to beget conviction that it is true. Repetition creates confidence and conviction, as contradiction and repugnance create suspicion and doubt. An assertion that the knowledge by the jury that the defendant made the confession on January 9th under oath to the coroner at the inquest did not have and could not have had any influence or consideration in their determination as to the effect which they should give to the confession to the assistant district attorney seems to me inaccurate and unjust. It is well within a reasonable and just conclusion that, in the absence of that knowledge, they

might and would have found, under all the circumstances and conditions, that the confession to the assistant district attorney did not possess the credibility justifying, in connection with the other evidence, the verdict and conviction. Assuredly, it is impossible for us to say that the confession of January 9th, which the People upon the trial deemed material and important, could not have added to any extent to the value and effect of the latter or influenced to any extent the verdict.

The jury were to determine whether or not the confession to the district attorney was voluntary. If they found it involuntary, they were to reject it. Upon this question, the illegal and incompetent proof of the confession of January 9th bore directly and illicitly. The finding that the first was voluntary would be an argument and ground for the finding that the second was of the like nature.

It may be that the verdict of the jury was based upon the illegal confession of January 9th. The court emphatically and forcibly brought it to their attention and instructed them to reject that of January 27th or that of January 9th if they found it was not voluntary. It was quite possible for the jury to have put that of January 27th wholly aside and found, under the charge, that that of January 9th was voluntary and truthful. The conviction of the defendant may, therefore, rest upon a statement of defendant, illegal and incompetent, which ought not to have been proved or received in evidence and which was in law and fact compulsory and involuntary.

The judgment of conviction should be reversed and a new trial ordered.

WILLARD BARTLETT, Ch. J., CHASE and CARDOZO, JJ., concur with MILLER, J.; SEABURY, J., concurs in result in separate opinion; COLLIN, J., reads dissenting opinion, and HOGAN, J., concurs.

Judgment of conviction affirmed.